RENDERED: APRIL 2, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0875-ME

DOUGLAS SAVILLE                                                                 APPELLANT

APPEAL FROM BOONE FAMILY COURT
v.       HONORABLE LINDA R. BRAMLAGE, JUDGE
ACTION NO. 16-CI-01160

PATRICIA SAVILLE                                                                 APPELLEE

AND                          NO. 2019-CA-1604-MR

DOUGLAS SAVILLE                                                                 APPELLANT

APPEAL FROM BOONE FAMILY COURT
v.       HONORABLE LINDA R. BRAMLAGE, JUDGE
ACTION NO. 16-CI-01160

PATRICIA SAVILLE                                                                 APPELLEE

** ** ** ** **

BEFORE:  CALDWELL, MCNEILL, AND TAYLOR, JUDGES.

CALDWELL, JUDGE:  In these two related appeals stemming from the same dissolution of marriage action, Douglas Saville asserts errors in the Boone Family Court's initial determination of maintenance, property, and child support and in its denial of his motion to modify maintenance.  We affirm.

## FACTS

Douglas ("Doug") Saville and Patricia ("Tricia") Saville were married in August 2000.  They have two children, born in 2005 and 2008.  Doug and Tricia separated in August 2016, and Doug filed a petition for divorce later that month.

In March 2017, the family court entered an agreed order concerning several matters.  The order's terms included the parties having joint custody with the children residing primarily with Tricia.  Doug had parenting time on alternate weekends, some holidays, and for a few weeks of summer vacation.  Doug was responsible for paying the mortgage on the marital residence in lieu of child support and maintenance under the agreed order.

In February 2018, the family court entered a decree dissolving the marriage but reserved ruling on other issues.  After the parties sold their marital residence in late April 2018, Tricia filed a motion for child support and

-2-

maintenance on May 18, 2018. The parties presented proof to the family court on several trial dates over the next several months. Generally, the proof showed that Doug earned about four times what Tricia earned—with Doug earning about $100,000 a year and Tricia about $25,000 a year at their respective full-time jobs.

An agreed temporary order was entered in late November 2018 for Doug to pay $1,000 per month in child support. By the last trial date in mid-February 2019, Doug had paid $3,000 in child support. Meanwhile, the parties also negotiated the terms of a partial property settlement agreement which they filed in the family court in early March 2019.

A few days after the partial property settlement was entered, the family court entered supplemental findings of fact and conclusions of law. It entered a supplemental dissolution decree approving the partial property settlement agreement, ruling on remaining property division issues, and awarding child support and maintenance to Tricia. The family court set child support at about $1,100 a month and maintenance at about $1,000 a month—both effective May 15, 2018—with the maintenance award to terminate within four years.[1] And the family court determined that Doug then owed arrearages of $9,000 for maintenance and about $7,400 for child support for the period from May 15, 2018

---

[1] Specifically, the maintenance award would terminate in four years or sooner if Tricia died, remarried, or cohabited with an intimate partner.

through February 15, 2019 (the last date of trial).  It ordered Doug to pay the child support arrearage within 90 days and the maintenance arrearage within a year.

Both parties filed motions to alter, amend, or vacate the March 2019 decree under Kentucky Rules of Civil Procedure (CR) 59.05.  Following resolution of these CR 59.05 motions, Doug filed a timely appeal from the family court's March 2019 decree.  He alleged errors concerning property division, maintenance, and child support in this first appeal.

A few weeks after entry of the March 2019 decree, and while the parties' CR 59.05 motions were still pending, Doug filed a motion to modify parenting time and for a shared parenting time credit on his child support obligation.  Doug stated that he had previously agreed to more limited parenting time because he had relocated to Pennsylvania to perform work for his employer. But after completing his work in Pennsylvania, he would soon move back to the Northern Kentucky area.  So, he requested that the family court award him a shared-parenting schedule and a shared-parenting credit on his child support obligation.  After a hearing on his request for a shared parenting schedule, the family court granted him equal parenting time with Tricia.

A few weeks later, Doug filed a motion to modify maintenance.  In his motion, he alleged *inter alia* that his income was reduced when he relocated back to Kentucky.  Specifically, he alleged that he lost about $2,000 a month in

funds for travel expenses. He also argued that the maintenance award of $1,000 a month was unwarranted because it was based on Tricia's anticipated rather than actual expenses.

On September 25, 2019, the family court entered an order granting Doug's request to modify child support and reducing his child support obligation by about $700 a month effective June 13, 2019 (the date he was awarded equal parenting time). However, the family court denied his motion to modify maintenance and also denied a request by Tricia for increased maintenance.

Doug then filed a timely appeal of the family court's order, which recited that it was final and appealable with no just cause for delay. He asserts error in the family court's denying his motion to modify maintenance in this second appeal. The parties did not raise any other issues in this second appeal.

Prior to Doug filing his notice of appeal from the September 2019 order which denied maintenance modification among other things, Tricia had filed a timely motion under CR 59.05 to alter, amend, or vacate the same September 2019 order. She requested *inter alia* that the family court amend its finding concerning the amount of Doug's monthly gross income to reflect monthly benefits from his employer (including a vehicle allowance, cell phone reimbursement, and gas card) as well as wages. She asserted his gross monthly income was about $800 more than the family court had found and asked the family court to re-calculate

child support under the guidelines from about $400 a month to about $500 a month. Tricia also asked the family court to alter its ruling on maintenance and to increase the monthly maintenance payment to help her meet her monthly expenses.

After the parties completed briefing in this Court, the family court entered an agreed order in August 2020 resolving Tricia's CR 59.05 motion. In this agreed order, the family court sustained Tricia's objection to its finding about Doug's gross income, and Doug stipulated to receiving gross monthly income in the amount Tricia asserted in her CR 59.05 motion (about $800 a month over what the family court originally found). In this same agreed order, Tricia also withdrew her motion to alter, amend, or vacate the family court's order regarding her request to obtain an increase in maintenance. So, the family court's denial of maintenance modification remained intact after its resolution of the CR 59.05 motion, but it modified its finding about Doug's gross income.

The written record on appeal transmitted to us contained Tricia's CR 59.05 motion but did not contain the August 2020 agreed order resolving it. However, we reviewed this August 2020 agreed order via CourtNet in order to properly review the family court's latest resolution concerning the motion to modify maintenance and findings on matters directly affecting this request.[2]

---

[2] *See Polley v. Allen*, 132 S.W.3d 223, 226 (Ky. App. 2004) (discussing doctrine of judicial notice).

In the interest of judicial economy, we consider both the first appeal (from the March 2019 decree) and the second appeal (from the September 2019 order denying Doug's motion to modify maintenance) in this opinion. Further facts will be discussed as necessary.

## STANDARD OF REVIEW

"We review a [family] court's decisions regarding child support, maintenance, and the division of assets pursuant to a divorce decree for an abuse of discretion." *Duffy v. Duffy*, 540 S.W.3d 821, 826 (Ky. App. 2018). Similarly, we review a family court's denial of a motion to modify maintenance for abuse of discretion. *Tudor v. Tudor*, 399 S.W.3d 791, 793 (Ky. App. 2013). While reviewing the family court's rulings on these matters for abuse of discretion, its "factual findings are given deference," *id.*, so that these factual findings cannot be disturbed unless clearly erroneous, meaning unsupported by substantial evidence. *Duffy*, 540 S.W.3d at 826.

## ANALYSIS

*No Reversible Error in Factual Findings on or Disposition of P&G Shares*

Doug contends that the family court issued clearly erroneous factual findings about the parties still possessing Proctor and Gamble stock shares ("P&G shares") when dividing the marital property. Incorporating the parties' Partial Property Settlement agreement into its March 2019 supplemental decree, the

family court addressed a few remaining disputed issues about property division in this decree—including disposition of any remaining P&G shares.

Doug presented the parties' joint tax return for the 2016 tax year which reported the sale of a number of P&G shares in the last few months of 2016—after the parties had separated in early August 2016. Doug testified that after these shares were sold, the parties no longer owned any P&G shares. He testified that the shares had been sold to pay off marital debt and that Tricia knew of and participated in the sales. Tricia, on the other hand, testified that the P&G shares were in Doug's name, that he had sole control over the P&G shares, and that she was not aware of or involved in selling these shares and did not use or receive any proceeds from the sale of P&G shares.

Tricia's counsel cross-examined Doug about a document showing that the parties had possessed about 408 P&G shares at the end of December 2014, despite the parties' tax return for the 2016 tax year showing that about 244 P&G shares had been sold in 2016. Addressing Doug's assertion that there were no remaining P&G shares held by the parties, counsel asked Doug about when other shares had been sold since the tax return only showed that about 244 P&G shares were sold in 2016 and the other document showed the parties owning 408 P&G shares at the end of 2014. Doug testified that he did not know since, according to

him, his wife[3] had taken records from his office, but he suggested that maybe the other shares had been sold in 2014. (From our review of the portion of his testimony cited by the parties, it does not appear that he specifically addressed or was asked to address whether any shares had been sold in the year 2015.) Tricia asserts that since the P&G shares were in Doug's name, Doug alone could presumably produce sale documents, but he failed to do so despite her requests for production of documents.

The family court's findings included a detailed recitation of how many shares had been sold and for what amounts in 2016. The family court noted Doug's testimony that proceeds from sales of the P&G shares were no longer in existence because they had been used to pay off expenses and that no more P&G shares remained. But the family court found that there was no other evidence to substantiate his testimony about all proceeds having been spent or there being no P&G shares remaining in the parties' possession.

Although the family court noted Tricia's testimony about Tricia not participating in or benefitting from the sale of P&G shares, the family court found that the jointly filed tax return for the 2016 tax year indicated that Tricia was aware of the 2016 sales. The family court also noted Doug's testimony on cross-

---

[3] As Doug had apparently remarried sometime after the initial decree dissolving the marriage, it is not totally clear whether he was referring to Tricia or someone else when testifying about documents being removed from an office by his wife.

examination admitting that a document showed the parties' owning 408 P&G shares at the end of 2014 despite the 2016 tax return showing 244.585 shares sold. The family court found: "There would have been remaining 164 shares of P&G stock, which [Doug] could not account for other than to say they were no longer in existence."

The family court found the P&G shares were marital property and subject to division. It determined that Doug did not owe Tricia any proceeds from the 2016 sales of about 244 P&G shares since Tricia must have been aware of these sales based on the 2016 joint tax return. But the family court ruled that Doug must either transfer one-half of the other 164 P&G shares (thus, 82 shares) to Tricia or pay her for the value of 82 P&G shares:

> Petitioner [Doug] shall transfer to Respondent [Tricia] 82 shares of P&G stock, representing one half of the 164 remaining shares of P&G stock, which Petitioner could not account for. If Petitioner is unable to produce one-half of the 164 remaining shares, Petitioner shall pay Respondent the closing share price of 82 shares of P&G stock as of the date of the entry of the Supplemental Decree of Dissolution of Marriage or as of December 31, 2014, whichever amount is least.

Having reviewed the record, we disagree with Doug's contention that the family court issued a clearly erroneous factual finding about there being P&G shares remaining in the parties' possession. We construe the family court's

-10-

language as not definitively finding whether P&G shares remained in the parties' possession but simply finding that Doug could not account for 164 P&G shares.

We must give due regard to the family court's unique opportunity to assess the credibility of witnesses under CR 52.01. So, we cannot say that the family court was compelled to believe Doug's testimony that no P&G shares remained in the parties' possession. Given the evidence presented of the parties owning 408 shares at the end of 2014 and selling 244 shares in 2016, coupled with Doug's failure to produce documentation of the sale of the other 164 shares and Tricia's testimony these shares were under his sole name and control, there is substantial evidence to support the family court's finding that Doug could not account for 164 shares. And regardless of the current status of such shares, we discern no abuse of discretion in the family court ordering Doug to transfer 82 P&G shares to Tricia or to pay her for the value of 82 P&G shares[4] from our review of the record.

In short, there was no reversible error in the family court's handling of the matter of P&G shares as part of the division of marital property.

---

[4] The family court found that Doug received for sales of 244 P&G shares "a total of $21,203.00" in 2016. (Supplemental Findings of Fact and Conclusions of Law 3/8/2019, p. 12). The family court awarded Tricia 82 P&G shares or their value as of two alternate valuation dates, whichever was lower, in the decree. We are unaware of the dollar value of these P&G shares on either of these two alternate valuation dates. But as 244 P&G shares were sold for just over $20,000 in 2016, the value for about one-third as many stocks by either alternate valuation date (in 2014 or 2019) would likely represent a relatively small portion of the parties' total assets.

-11-

*No Reversible Error in Family Court's Decision to Award Maintenance*

Under the partial property settlement agreement incorporated in the decree, Tricia retained her non-marital individual retirement accounts (IRAs) worth around $100,000. And the family court awarded her a greater share of the marital property than Doug, stating it did so because Doug had sold some marital assets for less than fair market value without consulting or informing Tricia. The marital property awarded to Tricia included a portion of a marital annuity account held in Doug's name and about $54,000 due to her from the sale of the marital residence, for which the proceeds had hitherto remained in escrow.[5] In sum, Tricia retained assets valued around $200,000 with around half of these assets in IRAs.

The proof at trial showed that Tricia was employed full-time as an office manager at her father's auto body shop and had been earning about the same salary there for several years. Tricia's father testified that her salary had not gone up because her salary (like that of his other employees) depended on how much insurance companies were willing to pay for repairs. Though not discussed by the family court in its judgment, Tricia testified that working for her father provided flexibility and other advantages in caring for her children—for example, she or her

---

[5] Under the terms of the parties' partial property settlement agreement incorporated in the decree, Tricia would receive about $43,000 for her one-half portion of the proceeds, plus Doug agreed to pay her around $11,000 from his half of the proceeds in order to reimburse her for other things.

mother could pick the children up from school and the children could come to her workplace after school.

Tricia testified to paying the insurance for an older vehicle (a 2001 model) in her possession which she testified was not reliable or in good condition. But she admitted she was also able to use a somewhat newer vehicle associated with her father's business for which she did not have to pay insurance. Her father testified that she (like other employees) could take a company vehicle home, in part because she was sometimes asked to drive directly from her home to pick up customers or perform other work tasks. And Tricia and her father testified that she was able to use a credit card for her father's business for personal expenses,[6] although they also testified she was expected to reimburse the business for such personal expenses.

Before the trial, Tricia had submitted an affidavit in which she stated her expenses included $1,250 monthly rent and a $200 a month car payment. At trial, she admitted that she did not currently have a car payment but that she budgeted $200 a month for a car payment to get a more reliable car. And she testified that her parents had allowed her to live rent-free in the house owned by her mother for the last several months to help her out during the divorce

---

[6] According to Tricia's testimony, the personal expenses she used the credit card for were child-related.

proceedings and while the marital home sale proceeds remained in escrow.  She

also admitted that, as of the last trial date, there was no lease agreement in effect

about her living in the house owned by her mother.  But she and her father both

testified that she would be expected to pay rent after the divorce case concluded.[7]

The family court found that even though Tricia was employed, "she is

not able to meet her anticipated monthly living expenses based upon her net

income of $1,602.00 per month."  (Supplemental Findings of Fact and Conclusions

of Law 3/8/2019, p. 8).  And the family court awarded her $1,000 per month in

maintenance for four years, noting she had requested maintenance for six years.

The family court stated that its maintenance award took effect on May 15, 2018.[8]

The family court noted that Doug had not made any maintenance payments after

the motion for maintenance was filed in May 2018 following the marital residence

---

[7] Before the September 2019 order ruling on Doug's request to modify maintenance, Tricia submitted a lease agreement dated March 1, 2019 wherein she agreed to pay $1,250 per month rent for the house owned by her mother and cancelled checks showing she paid this monthly rent starting in March 2019.  But from our review of the written record, it does not appear that Tricia submitted this March 2019 lease agreement to the family court before it entered its March 2019 supplemental decree, findings of fact, and conclusions of law.

[8] Possibly, the family court selected this date for the maintenance award to commence based on its finding that Tricia "filed a motion on May 15, 2018 requesting the payment of maintenance." (Supplemental Findings of Fact and Conclusions of Law 3/8/2019, p. 8).  However, Tricia states that she filed her motion for child support and maintenance on May 18, 2018 in her brief, which is consistent with our review of the written record.  Regarding child support, we note the parties agreed to let the family court determine the effective date of the child support obligation in the temporary agreed order entered in late November 2018.  To the extent that the family court's March 2019 judgment may contain a clerical error misstating the date Tricia's motion for maintenance and child support was filed, the family court may correct any clerical error at any time upon a party's motion or on the family court's own initiative pursuant to CR 60.01.

sale. So, the family court determined there was now an arrearage of $9,000 back maintenance due for the nine months between the filing of the motion and the last day of trial.

The family court also stated in its decree that Tricia should not have to suffer the tax consequences of removing money from her IRAs to support herself. And it found that her monthly expenses included "$1,250.00 for rent and $200.00 for a newer vehicle." It further noted Tricia's testimony that she could not continue to reside at the residence owned by her mother rent-free.

Doug argues that Tricia did not need maintenance and that the maintenance award was improperly based on anticipated rather than actual expenses. He also claims that Tricia claimed "fraudulent expenses" which she did not actually incur, citing her admission in testimony that despite her stated expenses of $1,250 a month for rent and $200 a month for a car payment in an affidavit, she had not actually been paying her parents rent or making a car payment. And he contends that since Tricia was awarded about $1,100 a month in child support, retained significant assets, was awarded an even greater share of marital assets than him, and "was rendered debt free," the family court erred in awarding her maintenance.

Tricia points out that even though marital debts had been extinguished, the family court's decree provided that each party was responsible

for paying his/her attorney fees "after the division of property is accomplished[.]" And according to the family court's findings, Tricia's attorney fees amounted to over $30,000 at that point. Tricia had requested that Doug pay her attorney fees, but the family court denied this request.

Despite the allegations of error raised by Doug, we agree with Tricia that the family court did not misunderstand the evidence about Tricia's expenses or abuse its discretion in awarding Tricia maintenance. The family court indicated its awareness that Tricia had not been previously paying rent by noting her testimony that she could not continue to reside at her house rent-free. And although less clear, we believe that the family court also indicated its awareness that she did not have an existing obligation to pay debt under a car note in finding she could not meet her "anticipated monthly expenses" based on her net income and referring to a monthly expense of "$200.00 for a newer vehicle" after noting that Tricia (unlike Doug) had not been able to buy a new car after their separation.

As for Doug's assertions that Tricia claimed "fraudulent expenses" in her affidavit which she did not actually incur, we understand how the affidavit as drafted might seem misleading.[9] Better practice would have been to state clearly that although Tricia did not currently have a monthly house rent payment or

---

[9] The affidavit stated Tricia "has the following expenses" including $1,250 monthly for "Housing; mortgage" and $200 monthly for "Auto payments." (Respondent's Exhibit No. 20, Envelope IV of Record on Appeal).

monthly car payment, she anticipated having rent and car payments in stated amounts in the future. And we admonish Tricia and her counsel to take greater care in the future to ensure that factual assertions made to courts are accurate, particularly in documents submitted under oath such as affidavits. *See generally* CR 43.13; CR 11.

Nonetheless, the family court did not find nor do we conclude that the evidence compels a finding of fraud in the sense of intentional deception, particularly since Tricia admitted in her testimony that she did not currently have monthly obligations for rent or car payments. And the family court clearly understood that the $1,250 for rent and $200 for a car payment were anticipated monthly expenses rather than previously incurred expenses.

Kentucky Revised Statutes (KRS) 403.200(1) provides in pertinent part that a family court may properly grant maintenance "only if it finds that the spouse seeking maintenance: (a) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs; and (b) Is unable to support himself through appropriate employment[.]"

After discussing in detail what accounts (and other assets) Tricia retained as either non-marital property or received as her share of marital property, the family court found that Tricia should not be required to suffer the tax consequences of liquidating her IRAs to support herself. We construe this

-17-

statement as more generally finding that Tricia lacked sufficient property to provide for her reasonable needs, thus satisfying KRS 403.200(1)(a).

As for KRS 403.200(1)(b)'s requirement that the family court find that the spouse seeking maintenance show inability to support oneself through appropriate employment, this was satisfied by the family court's finding that Tricia's net monthly income was not sufficient to meet her anticipated monthly needs despite her employment. There is no dispute that Tricia was employed, and there was no finding of under-employment. Thus, the family court implicitly found that Tricia's employment was appropriate. And as the family court specifically found that her net monthly income was insufficient to meet her anticipated monthly needs (which it did not find unreasonable), it implicitly found that she was unable to support herself through appropriate employment.

And despite Doug's arguments to the contrary, we discern no abuse of discretion by the family court in awarding Tricia maintenance for a four-year period based on our review of the record before us. Tricia admitted that she did not have a rent payment to make and was not currently paying off debt under a car note at the time of trial. But Tricia testified that her earnings from her employment were used up each month in paying credit card bills, utilities, and child-related expenses and that without her parents offering her rent-free housing during the divorce proceedings, she would not have been able to afford a place to live. And

-18-

as she points out, much of her liquid assets would be subsumed in paying her attorney fees.

As Doug asserts, the family court found Tricia to be in good health and did not specifically find that she would be unable to obtain more lucrative employment. But Doug, who did not file a reply brief, did not respond to Tricia's assertion in her brief that no evidence was presented to show that she was capable of earning more money. The family court noted that both parties had a high school education. And although not specifically noted in the judgment, both parties were in their forties at the time of trial from our review of the written record.

Given the lack of evidence that Tricia was voluntarily under-employed and Tricia's testimony that she could not afford to pay for housing given her net income and other expenses, we discern no abuse of discretion in the family court's award of maintenance especially in light of such factors as the length of the marriage and the relatively short duration of the maintenance award. The family court's award of maintenance did not prevent the parties from severing all ties for an unduly long time but, rather, afforded Tricia a reasonable opportunity to transition from financial dependence on her former spouse to independence. *See Daunhauer v. Daunhauer*, 295 S.W.3d 154, 156 (Ky. App. 2009) ("The goal of a maintenance award is to facilitate one's transition from dependence upon her former spouse to independence. This is consistent with another goal of the

dissolution process which is to sever all ties as much as possible as soon as possible.").

Though Doug cites *Light v. Light*, 599 S.W.2d 476 (Ky. App. 1980), to argue that maintenance should not be awarded unless it is truly needed, we note that the denial of the maintenance request[10] in that case was reversed. And we therein held that maintenance ought to be avoided if not strictly necessary to avoid prolonging the parties' dealings with each other. But we recognized that maintenance could be properly awarded where "circumstances of need and fairness demand." *Id.* at 479. Based on our review of the record here, there was evidence to support "circumstances of need and fairness" calling for a maintenance award.

Doug also argues that the $9,000 in back maintenance was not needed to cover expenses not actually incurred, citing *Daunhauer* and *Roberts v. Roberts*, 744 S.W.2d 433, 436 (Ky. App. 1988). Despite some discussion of considering "need" in maintenance cases or more specifically in ruling on motions to terminate or otherwise modify maintenance awards, these cases are factually distinguishable. For instance, *Daunhauer* involved a request to terminate maintenance for an ex-spouse who had become more than self-sufficient and even earned significantly

---

[10] The family court in *Light* had ordered both child support for younger children and a temporary maintenance award to help support an eighteen-year old child until he graduated from high school, but the family court otherwise denied the request for maintenance. *Id.* at 477. We reversed and remanded for the family court to reconsider the maintenance issue, especially in light of pension benefits to be received in retirement. *Id.* at 479-80.

more than the obligor spouse. 295 S.W.3d at 158, 161. And *Roberts* affirmed an increased maintenance award based on the ex-wife's declining income coupled with the ex-husband's increasing income and inheriting property (which produced interest income) upon the death of a second ex-wife. 744 S.W.2d at 436-37. In short, we do not construe these cases' holdings on the unique facts before them as particularly relevant to determining whether Tricia needs maintenance under the unique facts of this case.

Furthermore, considering all relevant factors such as the wide disparity in the parties' incomes, we find no fault in the family court not requiring Tricia to liquidate her IRAs to support herself. *See Daunhauer*, 295 S.W.3d at 159 (noting in dicta that retirement accounts are generally intended to meet future needs in retirement rather than current needs for employed persons); *Smith v. Smith*, 503 S.W.3d 178, 185-86 (Ky. App. 2016) (noting argument about the tax penalty consequences of withdrawing funds from retirement accounts in upholding maintenance award for ex-wife who received a share of ex-husband's retirement accounts). Nor can we fault the family court for not expecting Tricia to continue to depend on her parents' generosity rather than receive an appropriately rehabilitative award of maintenance. *See Leitsch v. Leitsch*, 839 S.W.2d 287, 289 (Ky. App. 1992) (holding family court abused its discretion in denying

maintenance to disabled spouse rather than awarding sufficient funds to allow him to meet his needs without depending on the generosity of family and friends).

Even the award of back maintenance does not amount to an abuse of discretion under the unique facts of this case. Despite not having to pay rent or a monthly car payment prior to trial, Tricia testified to barely being able to pay for utilities or credit card bills. She did not receive any maintenance and only $3,000 in child support during the nearly one-year time period between the marital home sale and the final trial date. She received only the modest income from her full-time job for several months while house sale proceeds remained in escrow. And though she would eventually receive about $54,000 from the sale of the marital residence, much of this would be used up in paying more than $30,000 in attorney fees. In sum, it was not an abuse of discretion for the family court to award her back maintenance for a period of relative penury during divorce proceedings.

In short, there was no reversible error in the family court's award of maintenance to Tricia.

### *No Reversible Error in Not Imputing Additional Income to Determine Child Support or Maintenance*

Next, Doug argues that the family court "erroneously failed to attribute gift income to" Tricia when determining the amount of child support and maintenance due. He believes the family court erred in not adding amounts for her

use of her father's business credit card, use of a vehicle, and receipt of rent-free housing from her parents to her wages to determine her income.

Concerning Tricia's use of her father's business credit card, both Tricia and her father testified that she was expected to pay him back for items she charged to this card. And the family court did not explicitly reject this testimony as lacking credibility. Given the evidence that Tricia was required to pay back what she charged to this card, we discern no error in the family court's not finding Tricia's use of this card to constitute additional income to her when calculating child support and maintenance obligations.

Concerning Tricia's use of her father's company's vehicle, Tricia's father testified that she (like other employees) could sometimes take the vehicle home but that this was because she was often required to go directly from her home in the vehicle to perform work functions. Despite any incidental personal use of the company vehicle by Tricia, testimony indicated that her possession of the vehicle also facilitated her performance of work functions. We cannot say the evidence cited by the parties compels a finding that Tricia's use of the company vehicle was purely a gift for her personal use.

Our precedent indicates that income should be broadly construed when determining gross income for purposes of child support calculations. *Clary v. Clary*, 54 S.W.3d 568, 573 (Ky. App. 2001) ("when determining child support,

the emphasis should be on including, not excluding, income especially where including the income more accurately reflects a parent's economic condition and financial circumstances for that year.")[11] But the value of the use of a vehicle here is perhaps not as easily quantifiable as the capital gains from a farm sale discussed in *Clary*—which a party argued were like lottery winnings and should not be counted in a single year. *See id.* at 573. Adding in an amount of imputed income for the vehicle use would not necessarily more accurately reflect Tricia's financial condition for the year. Furthermore, had the family court imputed some income for use of the car, the family court would still have power to deviate from the guidelines if needed to afford justice. KRS 403.211(2). While Tricia received a benefit in having use of the car, this benefit did not directly result in her receiving additional funds which she could use to pay expenses—thus, the family court did not abuse its discretion in not reducing child support or maintenance due to her use of the car.

As for Tricia's receipt of rent-free housing from her parents for a period of months while divorce proceedings continued, this was surely a gift as Tricia has not asserted that she would have to pay her parents back for the months

---

[11] Our quote from *Clary* is a quote from a case from another jurisdiction, *Howe v. Howe*, 516 S.E.2d 240, 245 (Va. App. 1999). We need not delve into Virginia domestic relations law in order to resolve this case but simply address the issues presented in this case in light of the principle recognized in *Clary*, 54 S.W.3d at 373.

she did not pay rent. Nonetheless, the family court did not commit reversible error in not imputing income to Tricia for the receipt of rent-free housing under the unique facts of this case.

Although not cited by the parties, we held that the family court's not imputing income for purposes of child support and maintenance for gifts from the recipient spouse's parents—specifically, free use of a house and vehicle as well as monthly cash payments—was an abuse of discretion in *Penner v. Penner*, 411 S.W.3d 775, 782 (Ky. App. 2013). But we do not read *Penner* as mandating that income must be imputed for purposes of determining child support and maintenance in every instance in which a party receives free use of a residence or vehicle. Instead, we believe that our conclusion that the family court abused its discretion depended on the unique facts of that case. And despite some factual similarities between this case and *Penner* (such as parents providing a house and a car to an adult child), we do not discern an abuse of discretion in the family court's not imputing income for purposes of determining child support and maintenance under the unique facts here. Here, the vehicle was provided to perform work for the adult child's parent's business, and free housing was provided on a temporary basis as a stopgap measure during divorce proceedings while the adult child's wages from full-time employment were insufficient to cover housing and other expenses.

Even if $1,250 (the amount Tricia later agreed to pay her parents in monthly rent) were added to her gross wages to arrive at her gross income for the several months preceding trial, there was still a significant disparity in the parties' income. Given this significant disparity in income along with other relevant factors (including the length of the marriage, Tricia's age and educational level, and the parties' standard of living[12] during the marriage), we cannot say that the family court abused its discretion in setting the amount ($1,000) or duration (four years) of maintenance. *See* KRS 403.200(2) (establishing family court's obligation to set forth just amount and duration of maintenance considering listed factors).

*No Reversible Error in Denying Request to Modify Maintenance*

Finally, we review the family court's denial of Doug's motion to modify maintenance. In reviewing this issue, it is appropriate to consider the amended finding of Doug's income in the agreed order resolving Tricia's CR 59.05 motion—even though the family court did not resolve the CR 59.05 motion until after briefing to this Court was completed. *See* CR 73.02(1)(e)(i):

> If a party files a notice of appeal after the date of the
> docket notation of service of the judgment required

---

[12] We are aware of Doug's assertions that the parties' standard of living was relatively modest during the marriage and/or that the couple lived beyond their means. But Tricia testified to the parties being able to purchase a bigger, newer home a few years after their marriage and their taking vacations and purchasing assets such as a boat and other recreational equipment and another house to rent out to others during the marriage. Regardless of whether others might enjoy a more opulent lifestyle or whether some might believe that the parties overspent based on their income during their marriage, there was substantial evidence to support a finding that their standard of living during the marriage afforded some comfort beyond mere subsistence.

by CR 77.04(2), but before disposition of any of the motions [including motions filed under CR 59] listed in this rule, the notice of appeal becomes effective when an order disposing of the last such remaining motion is entered.

With the amended finding about Doug's income (which he stipulated to), his income was still about three times higher than Tricia's. The maintenance award (effective May 15, 2018) is set to expire after four years at the latest—so about May 2022. Also, the family court substantially reduced Doug's child support obligation considering his reduced income and his increased, now-equal parenting time schedule.[13] Tricia submitted as proof a copy of a lease agreement and cancelled checks showing her obligation to pay $1,250 a month rent to her parents, as well as proof that her earnings remained about the same as before, in response to Doug's request to decrease her maintenance award.

Finding that Doug was aware of his maintenance obligation when he moved back to Kentucky and that he incurred substantially more debt in buying a

---

[13] In its September 2019 order which also denied the motion to modify maintenance, the family court reduced Doug's child support obligation to about $400 a month. In the August 2020 agreed order, Doug stipulated to his gross income being about $800 more per month than found in the September 2019 order. And this agreed order stated that the parties would calculate his future child support obligation at a later date upon verification of some insurance details, thus leaving the exact amount of child support unresolved at that time. However, since his stipulated gross income was still significantly less than that found by the family court in March 2019 (roughly $7,000 a month in September 2019 versus $9,000 a month in March 2019), his child support obligation going forward would presumably still be significantly reduced from that in the March 2019 decree especially with the shared parenting time adjustment.

-27-

new house and vehicle, the family court concluded that Doug's maintenance obligation was not unconscionable. Doug argues that due to his decrease in income, the maintenance award had become unconscionable, defined as meaning "manifestly unfair or inequitable" in *Combs v. Combs*, 787 S.W.2d 260, 261 (Ky. 1990) (quoting *Wilhoit v. Wilhoit*, 506 S.W.2d 511, 513 (Ky. 1974)).[14] Doug further contends that the family court failed to consider whether he could provide for his own needs in rejecting his request to modify maintenance, citing KRS 403.200(2)(f). We note that KRS 403.200(2) concerns factors to be considered in determining the proper amount and duration of maintenance—particularly in the context of determining initial awards.

Regarding modification of an existing maintenance award, KRS 403.250(1) states that "the provisions of any decree respecting maintenance may be modified only upon a showing of changed circumstances so substantial and continuing as to make the terms unconscionable." Although we would not suggest that a family court could not consider the obligor spouse's ability to provide for

---

[14] Although Doug cites both *Combs* and *Wilhoit* in his brief for the definition of *unconscionable*, neither case particularly calls for modification of maintenance in the case before us. *Combs* concerned whether the recipient spouse's cohabitation with an intimate partner could be grounds for termination of maintenance. 787 S.W.2d at 261. In *Wilhoit*, maintenance had already ceased due to the recipient spouse's remarriage, and the Kentucky high court reversed the family court's denial of a request for an increase in child support based on factors including evidence of increased costs of raising children. 506 S.W.2d at 512. At that time, KRS 403.250 governed modification of child support as well as maintenance so that is why KRS 403.250 was construed in *Wilhoit*. *See id.* at 513.

his/her own needs in ruling on a motion to modify maintenance, maintenance can only be modified if changed circumstances make the terms of the original award unconscionable under KRS 403.250(1).

Here, the family court determined that any difficulty in paying the original maintenance award was largely due to Doug's voluntary action in taking on more debt notwithstanding his maintenance obligation. Additionally, Doug admitted in his testimony that he was aware of his maintenance obligation when he bought his house and vehicle. Thus, under the facts here, we discern no reversible error in the family court's ruling, which is consistent with precedent including *Burnett v. Burnett*, 516 S.W.2d 330, 332 (Ky. 1974), *overruled on other grounds by Anderson v. Johnson*, 350 S.W.3d 453, 459 (Ky. 2011) (holding that obligor spouse's incurring substantial debt was not a change "of such character as to make the terms of the original judgment unconscionable within the requirements of KRS 403.250"). *See also Downey v. Rogers*, 847 S.W.2d 63 (Ky. App. 1993) (child support reduction unwarranted where the only change shown was obligor's voluntarily taking on substantial debt).

Considering all relevant factors (including the disparity in the parties' income, the reduction in child support due, the limited duration of the maintenance award, and Doug's voluntarily incurring more debt despite awareness of his existing obligations), the family court did not err in finding that the statutory

standard for modifying maintenance was not met, nor did the family court abuse its discretion in denying the motion to modify maintenance.

## **<u>CONCLUSION</u>**

For the foregoing reasons, we affirm the judgment of the Boone Family Court.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Jeffrey J. Otis<br>Covington, Kentucky | Michael J. McMain<br>Florence, Kentucky |